· No. 56,278

SHAWNEE MISSION MEDICAL CENTER, *Appellee,* v. KANSAS DEPARTMENT OF HEALTH AND ENVIRONMENT, and BARBARA J. SABOL, Secretary, Kansas Department of Health and Environment, *Appellants.*

(685 P.2d 880)

Opinion filed July 13, 1984.

*Charles V. Hamm,* of Topeka, argued the cause, and *Kay Y. Rute,* of the Kansas Department of Health and Environment, of Topeka, was on the brief for appellants.

*Reid F. Holbrook,* of Fallon, Holbrook & Ellis, of Kansas City, argued the cause and *John J. Fallon* and *G. Mark Sappington,* of the same firm, were with him on the brief for appellee.

The opinion of the court was delivered by

COOK, District Judge Assigned: This is an appeal from the judgment of the district court granting a certificate of need to Shawnee Mission Medical Center (Medical Center) after the requested certificate had been denied by the Kansas Department of Health and Environment (KDHE) following an administrative hearing.

The Medical Center is a hospital located in Johnson County and currently has a licensed capacity of 383 acute-care beds. Included in that total is a twenty-two bed inpatient Alcoholism Recovery Unit treatment program; providing acute level alcoholism detoxification and rehabilitation services. On August 9,

1982, the Medical Center filed Certificate of Need (C.O.N.) application #4-JO-062 with KDHE in accordance with K.S.A. 65-4801 *et seq*. The Medical Center sought approval to construct a "free-standing" Alcoholism Recovery Unit (A.R.U.) in which to relocate and expand the inpatient rehabilitation program by six beds, and to offer, for the first time, an outpatient treatment program. The proposal called for construction of a twenty-eight bed acute-care patient wing to be attached to the existing "Life Dynamics Center." The project would have encompassed 22,957 square feet of newly constructed and remodeled space at a total cost of $2,002,100.00, or $71,503.00 per bed. The Medical Center included in its application a request for licensure of twenty-two new acute-care beds in the existing patient tower, to replace the twenty-two rehabilitation beds which were moved to the new A.R.U. When this request was combined with the six new beds for the A.R.U., the application represented a net increase of twenty-eight beds, raising the Medical Center's licensed capacity from 383 to 411.

On September 24, 1982, a public hearing was held in Overland Park before KDHE Hearing Officer Scott Buckley. In support of the Medical Center's application ten witnesses appeared and testified, and two letters were admitted into evidence. Two other witnesses testified in opposition to the request, and three letters were admitted which opposed the certificate of need because of the request for additional beds beyond the Medical Center's current licensed capacity.

Based on this record, KDHE Secretary Joseph Harkins denied the application on November 22, 1982. Of the six review objectives and criteria adopted by the Kansas Statewide Health Coordinating Council pursuant to K.S.A. 65-4804 ("community need, quality of care, community support, financing, cost containment, and accessibility"), Harkins found the proposal failed to meet the criteria for community need and cost containment. More specifically, the Secretary stated the project was not needed to improve the availability of acute care services for alcoholism or medical/surgical patients in the applicant's designated service area, because there was already a surplus there of more than 1,500 acute-care beds and a correspondingly lower-than-recommended occupancy rate.

"The Secretary finds that the local health plan [the 1982-1986 Health Systems

Plan by Mid-America Health Systems Agency] has established a desired level of utilization for alcoholism treatment beds, and that these beds in the service area are operating at a level below that recommended. The Secretary further finds that the service area has an excess of all types of acute care beds . . . ."

Finally, regarding the issue of cost containment, the Secretary concluded the proposed project would unnecessarily increase the cost of patient care and health care services in general because of the estimated increase in debt service and depreciation per patient day and due to the absence of a demonstrated need for the additional beds.

On December 6, 1982, counsel for the Medical Center met with Secretary Harkins in Topeka. They spoke of the "overbedding" condition in Wyandotte and Johnson Counties, and Harkins alluded to that as being at least one of the reasons he denied their application. Upon further probing by counsel, Harkins responded that he would consider deletion of the proposed new beds in a request for reconsideration a "significant change in the application." Such a change, he said, would clearly remove one of the major reasons for his earlier denial, and would have a very good chance of receiving reconsideration, although he made no promises or guarantees about the ultimate result.

That very day Medical Center Senior Vice President Terry White wrote Secretary Harkins requesting reconsideration of his decision pursuant to K.A.R. 28-42-9(b)(2). In pertinent part, White said:

"It appears that the major rationale behind the denial of our proposal is the fact that it would result in the development of twenty-eight (28) additional acute-care beds. The fact remains, however, that our alcoholism recovery unit cannot continue operating in a cost-efficient manner in its present location regardless of whether or not acute-care beds are added.

"We are therefore requesting a reconsideration of your decision, based on a reduction in size of the free-standing alcoholism recovery unit to 22 beds and no net increase in the licensed acute-care capacity of SMMC. The area on the fifth floor of the patient tower currently occupied by the alcoholism recovery unit would be converted to other acute-care use as originally planned. However, twenty-two acute-care patient rooms would be converted from semiprivate to private occupancy, thus resulting in the maintenance of the medical center's current licensed bed capacity."

Secretary Harkins ordered a reconsideration hearing pursuant to K.S.A. 1983 Supp. 65-4808 and K.A.R. 28-42-9, finding White's request demonstrated "the existence of significant and relevant information not previously considered." In his order for recon-

sideration, however, Harkins limited the reconsideration hearing to the following issues:

"1. Revision of the application from a free-standing alcohol recovery unit and the addition of 28 acute care beds to a request for a free-standing alcoholism recovery unit with no increase in the number of beds.

2. A comparison of operating costs for the existing in-hospital alcoholism recovery unit with costs projected for the proposed free-standing unit.

3. The need to convert 22 semi-private rooms to private rooms."

The reconsideration hearing was held January 6, 1983, in the KDHE Topeka offices with Hearing Officer Scott Buckley again presiding. No witnesses, testimony or evidence were received in opposition to the request; in fact some who previously opposed licensure of the additional beds now wrote supporting the revised proposal for the "free-standing" A.R.U.

Approximately one month later Hearing Officer Buckley filed his report, recommending denial of the application. He first concluded the proposed relocation would not enable the Medical Center to reduce the operating expenses of the A.R.U., projecting instead that those expenses would increase:

"[A]lthough the applicant projects the Alcoholism Recovery Unit to operate profitably by 1986, the excess revenue over expenses results mainly from increased patient charges, rather than the improved cost-effectiveness of the Alcoholism Recovery Unit."

Although recognizing there could be some advantages flowing from integrated inpatient and outpatient programs, Buckley concluded there was no reason to believe an outpatient program could not operate independently especially since both programs were to be staffed separately anyway. Finally, he found the availability of acute-care beds in other Johnson County hospitals precluded any need for "additional [private] beds" in Shawnee Mission Medical Center.

The new Secretary of the KDHE, Barbara J. Sabol, adopted Buckley's findings and concluded the modified proposal did not meet the objectives of the community need or cost containment. She denied the C.O.N. application on February 15, 1983. Due to an error in calculations an amended order was entered on March 14, 1983.

The following day the Medical Center appealed her decision to the District Court of Johnson County, pursuant to K.S.A. 1983 Supp. 65-4816. After pretrial conference on June 10, 1983, Judge

Janette Howard allowed the Medical Center to conduct limited discovery. Former KDHE Secretary Joseph Harkins was deposed on June 30 and the deposition was made part of the record on September 8 over the agency's objection.

Oral argument was heard on September 26, 1983, and Judge Howard filed her decision on October 25 reversing the KDHE and granting the certificate of need to the Medical Center. The court found the KDHE decision not supported by the evidence, and arbitrary and capricious:

"It appears from the Court's examination of the record on appeal and the deposition testimony of Joseph Harkins that the principal reason for the denial of Shawnee Mission Medical Center's first application was the request for 28 new beds which would have the effect of increasing Shawnee Mission's licensed capacity from 383 to 411 beds. It further appears to this Court that Secretary Harkins' denial of this application was founded on adequate and supportable evidence. The denial of the modified application, however, was not only not supported by the evidence, but the rationale for such denial makes no sense to this Court whatsoever. The findings on two occasions made reference to additional beds in the service area of Shawnee Mission Medical Center and lack of utilization thereof. The modified application contains no request for additional beds. The hearing officer's findings imply that the project identified in the modified application will not be cost effective. However, the agency's own health plan asserts that the type of facility the hospital desires to construct is the most desirable from a utilization point of view. It appears to this Court, from its review of the record on appeal that the hearing officer's findings which were adopted by the Secretary do not contain a reasonable basis for denial of plaintiff-appellant's modified application."

KDHE appealed the decision of Judge Howard.

The United States Congress, in 1974, enacted the National Health Planning and Resources Development Act (42 U.S.C. §300k *et seq.*). The act creates a structure for carrying out health planning and dictates health resources allocation and regulation. Regulations imposed upon the various states are enforced by withholding federal funding from states that do not comply. The Kansas Legislature, in order to comply with the federal regulations and secure federal funding, passed in 1976 comprehensive certificate of need legislation (L. 1976, ch. 280), now codified as K.S.A. 65-4801 *et seq.* One of the legislative goals is to prevent unnecessary duplication of health resources and facilities, theoretically preventing higher medical costs resulting from duplication. The statutes require any health care facility wishing to undertake expansion, a new construction project, adoption of new major services, or other specified improvements, to obtain a

certificate of need by applying to the Secretary of KDHE. The statutes also provide for appeal of the agency's decision to the district courts. (K.S.A. 1983 Supp. 65-4816). For more detailed discussions of the purposes and goals of this health facility planning legislation, see *Kansas Dept. of Health & Environment v. Banks,* 230 Kan. 169, 630 P.2d 1131 (1981); *State ex rel. Metzler v. St. Francis Hosp. and Medical Center,* 227 Kan. 53, 605 P.2d 100 (1980); *Pratt v. Board of Thomas County Comm'rs,* 226 Kan. 333, 597 P.2d 664 (1979); *Suburban Medical Center v. Olathe Community Hosp.,* 226 Kan. 320, 597 P.2d 654 (1979); and *Olathe Hospital Foundation, Inc. v. Extendicare, Inc.,* 217 Kan. 546, 539 P.2d 1 (1975).

We have often stated the standards governing judicial review of a KDHE administrative denial of a certificate of need. Neither the district court nor an appellate court is permitted to try the case de novo and substitute its judgment for that of the agency. The district court is restricted to considering whether as a matter of law (1) the agency acted fraudulently, arbitrarily or capriciously, (2) the KDHE order is supported by substantial evidence, and (3) the agency action is within the scope of its authority. *In re Certif. of Need App. by Community Psychiatric Centers, Inc.,* 234 Kan. 802, 806, 676 P.2d 107 (1984); *Kansas Dept. of Health & Environment v. Banks,* 230 Kan. at 172; *Olathe Hospital Foundation, Inc. v. Extendicare, Inc.,* 217 Kan. 546. In making these determinations, a rebuttable presumption of validity rests with actions of the administrative agency; the burden of proof lies with the party challenging those actions. *Country Club Home, Inc. v. Harder,* 228 Kan. 756, Syl. ¶ 4, 620 P.2d 1140 (1980), *modified and reh. denied* 228 Kan. 802 (1981). Further in this regard, the legal interpretation of a statute by an administrative agency charged with its enforcement is entitled to a great deal of judicial deference. *Kansas Bd. of Regents v. Pittsburg State Univ. Chap. of K-NEA,* 233 Kan. 801, Syl. ¶ 3, 667 P.2d 306 (1983).

The district court may not reweigh the evidence or substitute its judgment for that of the agency. *Boswell, Inc. d/b/a Reno County Adult Care Home v. Harkins,* 230 Kan. 610, Syl. ¶ 1, 640 P.2d 1202 (1982). Thus, the question to be addressed by a district court is not whether a proposed facility or service is needed, but simply whether the record furnishes a substantial basis of fact

which supports the findings of the agency in its denial of the application for a certificate of need. *Kansas Dept. of Health & Environment v. Banks*, 230 Kan. at 175. In reviewing the district court's judgment, an appellate court must first determine whether the district court observed the requirements and restrictions placed upon it, and then make the same review of the administrative agency's action as does the district court. *Kansas State Board of Healing Arts v. Foote*, 200 Kan. 447, 451, 436 P.2d 828 (1968).

The Medical Center made no contention below that KDHE's denial was outside the scope of its authority. After making the necessary inquiries, the district court reversed KDHE, finding (1) there was no substantial evidence to support the agency's conclusions the proposal failed to meet the criteria of community need and cost containment, and (2) the denial of the application was therefore arbitrary and capricious.

KDHE claims its decision not to issue a certificate of need to the Medical Center, based upon its finding the application did not meet the objectives of community need and cost containment, was supported by substantial evidence and that arbitrary and capricious conduct cannot be found where an order of an administrative tribunal is based upon findings which are substantially supported by the evidence in the record. This is the sole issue in the present appeal.

"Substantial evidence" is defined as evidence which possesses both relevance and substance, and which furnishes a substantial basis of fact from which the issues can reasonably be resolved. *Jibben v. Post & Brown Well Service*, 199 Kan. 793, 433 P.2d 467 (1967). Stated another way, substantial evidence is such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion. *Kansas Dept. of Health & Environment v. Banks*, 230 Kan. 169, Syl. ¶ 3.

We will first consider whether there was substantial evidence to support the cost containment finding. The hearing officer found that relocation of the inpatient program (partially sought to avoid the presently burdensome cost-shifting from other departments of the hospital) would not result in alleged reduction of operating expenses for the alcoholism recovery program. Secondly, although recognizing certain advantages in sharing space, staff and supplies resulting from integration of the inpatient and

outpatient recovery programs, he found no reason to believe an outpatient program could not operate independently of the inpatient program since both were to be staffed separately and, as the outpatient program grew, less sharing of staff and space would occur. Finally, the hearing officer found that while operating expenses were projected to increase 25.1% over a three-year period; as a result of the proposed construction, patient charges during the same time were estimated to rise 54.6%, a 29.5% excess over expenses. This excess of charges over expenses was later determined to be only 17%, and an amended order reflecting this change was entered by the Secretary.

The Medical Center has asserted throughout these proceedings that the Alcoholism Recovery Unit loses money due to cost-shifting from other departments, especially utility allocations. A chart, entitled "Historical and Projected Revenues and Expenses," was included with the Medical Center's original application. The chart projected a substantial reduction in utility expense for the Alcoholism Recovery Unit beginning in 1984, the year the new unit was anticipated to be in operation. The figures showed a reduction from $300,000.00 in 1983 to $109,800.00 in 1984. During the reconsideration hearing a revised chart was received into evidence which, for some unexplained reason, revealed the anticipated utility savings had materially decreased - from a projected cost in 1983 of $258,458.00 to $279,135.00 in 1984. In fact, as reported by the hearing officer, the revised projections showed increased costs in all areas of operation through 1986, the last year covered by the revised chart.

The increased operating expenses projected for the proposed integrated A.R.U. are offset by an anticipated increase in revenues. In fact, the Medical Center indicates an integrated program could become self-supporting by 1986. The increased revenues, however, can be primarily attributed to the substantial increase in patient charges referred to previously, rather than the improved cost-effectiveness of the proposed integrated program.

From the evidence presented before the hearing officer, we can appreciate the desires of the Medical Center for an integrated inpatient/outpatient alcoholism recovery program. It is evident that such a program could utilize at least some sharing of space, staff and supplies, would enable the hospital to better

coordinate program planning and supervision, and would enhance the ease of transferring patients between modes of treatment. KDHE and its Secretary were charged, however, with the duty of weighing the desirability and efficiency of an integrated alcoholism recovery program against the increased costs associated with the proposed project. As we noted in *Kansas Dept. of Health & Environment v. Banks*, 230 Kan. 169:

"The evaluation of any proposed health care project against the review standards requires considerable expertise in the field of health care economics. The state agencies which participate in the process are bound by law to attempt to implement the national planning goals of containing rapidly growing costs and avoiding duplicative services. Each 'certificate of need' proceeding is an exercise in the inherently inexact science of determining how society's scarce health care resources might best be allocated." 230 Kan. at 171.

We find substantial evidence in the record to support KDHE's finding that the amended proposal did not satisfy the review criteria of cost containment, as established by the Kansas Certificate of Need Program. The rapidly growing costs of medical services must be curtailed, especially when the same or like services are available in the service area or can be provided at a lesser cost. The Medical Center's own figures reflect a 42.1% rise in patient charges, over a three-year period, resulting from the project. This, in itself, is a substantial increase in health care costs. In light of the fact it also represents a 17% excess over projected operating expenses, there was more than sufficient evidence from which the KDHE could conclude the Medical Center failed to establish cost containment. In the instant case it appears an outpatient alcoholism recovery program can be developed, even assuming the same is needed in the service area, at the Medical Center without the increased costs associated with a new "free-standing" unit.

In view of our findings on the cost containment criteria, we find it unnecessary to review the community need finding entered by KDHE. Suffice it to say we have found far less substantial evidence to support the agency's findings on community need. Any application for a certificate of need must, however, meet all six review criteria or standards or it must fail. We, therefore, reverse the district court's judgment ordering KDHE to issue a certificate of need to the Medical Center.

This case is remanded to the district court with instructions to deny the certificate of need to Shawnee Mission Medical Center.

HOLMES, J., not participating.